# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-3234

REUBEN ADAMS,

*Petitioner-Appellant,*

v.

BYRAN BARTOW,

*Respondent-Appellee.*

_____

**Appeal from the United States District Court
for the Eastern District of Wisconsin.**
No. 00-C-407—**Patricia J. Gorence**, *Magistrate Judge.*

_____

ARGUED JANUARY 16, 2003—DECIDED JUNE 3, 2003

_____

Before FLAUM, *Chief Judge*, and COFFEY and RIPPLE, *Circuit Judges.*

FLAUM, *Chief Judge.* Reuben Adams was committed to the custody of the Wisconsin Department of Health and Social Services after a jury found him eligible for confinement pursuant to the state's Sexually Violent Person Commitments Statute, Wis. Stat. ch. 980. Adams then petitioned for a writ of federal habeas corpus, *see* 28 U.S.C. § 2254, but the district court denied relief. We affirm.

## I. BACKGROUND

Adams's history of sexual misconduct dates back to 1982, when he received a probationary sentence after being

convicted of third-degree sexual assault on a sixteen-year-old girl. Eight years later Adams was arrested again after he engaged in repeated sexual acts with his eleven-year-old stepdaughter. For that offense he pleaded guilty to second-degree sexual assault of a child and was sentenced to four years in prison. Adams's extensive criminal history also includes nonsexual offenses such as robbery, intimidation of a witness, battery, and burning and damaging property. Almost all of his offenses involved female victims.

In August 1994 the State of Wisconsin filed a petition alleging that Adams was eligible for confinement pursuant to the Sexually Violent Person Commitments Statute, Wis. Stat. ch. 980. Chapter 980 requires the state to prove beyond a reasonable doubt that the subject of the petition is a "sexually violent person," which is defined as "a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect or illness, and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." Wis. Stat. § 980.01(7). A "mental disorder" is defined in turn as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 980.01(2).

In April 1995 a Milwaukee County circuit judge held, like many had before her, that Chapter 980 was facially unconstitutional and thus dismissed the state's petition. *See State v. Post*, 541 N.W.2d 115, 135 n.1 (Wis. 1995) (Abrahamson, J., dissenting) (noting that approximately one-half of the Wisconsin circuit court judges who had considered the constitutionality of Chapter 980 had found the statute invalid). The Wisconsin Court of Appeals summarily reversed, however, based on intervening Wisconsin Supreme Court decisions that upheld Chapter 980 against constitutional chal-

lenge. *See Post*, 541 N.W.2d 115; *State v. Carpenter*, 541 N.W.2d 105 (Wis. 1995). On remand a week-long jury trial was held during which the state presented the testimony of two expert witnesses: Dr. Kenneth Diamond, a senior staff psychologist for the Wisconsin Department of Corrections, and Dr. Ronald Sindberg, a psychiatrist at Mendota Mental Health Institute. Dr. Diamond testified that Adams suffers from antisocial personality disorder ("APD"), which is generally characterized by impulsiveness, inability to show remorse, and inability to learn from experience. This diagnosis, coupled with Adams's "long and chronic history [of] sexual[ ] violence against females," his refusal to participate in sex offender treatment programs, and the fact that his time in prison had not changed his behavior, led Dr. Diamond to conclude that Adams was "a risk and it's highly probable that he would recommit and reoffend." Thus, in Dr. Diamond's opinion, Adams qualified as a "sexually violent person" under Chapter 980.

Dr. Sindberg did not personally examine Adams (because Adams refused to be interviewed by him) but, after reviewing the medical records, concurred with Dr. Diamond's diagnosis of APD. Dr. Sindberg testified that Adams had no remorse and was indifferent to the fact that he had sexually assaulted others. Then, based on his evaluation of thirty-one risk factors, Dr. Sindberg concluded that there was "a substantial probability that [Adams] will reoffend or recommit a sexually violent act." "Substantial probability," according to Dr. Sindberg, meant "much more probable than not."

At the conclusion of trial, during which Adams did not present any expert testimony of his own, the jury found that Adams met the criteria for commitment as a sexually violent person under Chapter 980. Adams appealed, claiming among other things that Chapter 980 was unconstitutional as applied because "antisocial personality disorder is too imprecise a category to pass due process muster." *In re*

*Adams*, 588 N.W.2d 336, 340 (Wis. Ct. App. 1998). The Wisconsin Court of Appeals rejected his argument:

> [T]he fact that "antisocial personality disorder," standing alone without any other diagnosis *or evidence*, could never lead to a finding that a defendant, without a history of sex offenses, is a "sexually violent person," does not mean that that condition, *in combination with evidence satisfying the additional criteria of § 980.01(7), stats.*, cannot constitutionally support that finding. . . . It is that additional coupling that, in Justice Kennedy's words, "offer[s] a solid basis for concluding that civil detention is justified."

*Id.* at 341 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 373 (1997) (Kennedy, J., concurring)). Thus, the court held, "the inclusion of 'antisocial personality disorder' as, potentially, a 'condition' qualifying as a 'mental disorder' under the statute does not render the statute unconstitutionally imprecise." *Id.* at 340.

Adams also urged the appeals court to find the evidence insufficient "because neither of the State's experts gave testimony that would allow the jury to find beyond a reasonable doubt that [he] was substantially likely to commit another sexually violent offense." *Id.* The court rejected this argument as well:

> The evidence, largely undisputed, included information about Adams's history of sexually violent crimes, history of non-sexual crimes and antisocial behavior, failures under court-ordered supervision, denial of responsibility, refusal to participate in sexual assault treatment programs and drug/alcohol treatment programs, and his sexual offense recidivism. Further, the psychologists' testimony was more supportive of the State's position than Adams claims. Dr. Diamond testified that Adams is "a risk and it's highly probable that he would recommit and reoffend." Dr. Sindberg testified

that, based on his evaluation of thirty-one risk factors, there was "a substantial probability that [Adams] will reoffend or recommit a sexually violent act," and that, in his analysis, he considered "substantial probability" to mean "much more probable than not."

Thus, as the State argues, the psychologists' testimony, standing alone, may very well have satisfied the standard. Unquestionably, however, their testimony in combination with the other evidence provided a sufficient basis for the jury to conclude beyond a reasonable doubt that Adams is dangerous because he suffers from a mental disorder that renders him substantially probable to engage in acts of sexual violence.

*Id.* at 341-42 (footnote omitted). The Wisconsin Supreme Court denied Adams's petition for review.

In March 2000 Adams petitioned for federal habeas corpus under 28 U.S.C. § 2254, alleging that his commitment violated due process. The district court appointed counsel for Adams and ordered briefing plus supplemental briefing following the Supreme Court's decision in *Kansas v. Crane*, 534 U.S. 407 (2002). In August 2002 the court denied Adams's petition but granted him a certificate of appealability on the following issues:

Whether the state court of appeals['] decision rejecting the petitioner's due process challenge to his commitment under Chapter 980 of the Wisconsin Statutes was an unreasonable application of *Kansas v. Hendricks* [521 U.S. 346 (1997)] or *Foucha v. Louisiana* [504 U.S. 71 (1992)]; and

[W]hat impact, if any, *Kansas v. Crane*, 534 U.S. 407 (2002), has on the analysis of the petitioner's constitutional claims.

## II. DISCUSSION

For Adams to obtain federal habeas corpus relief, he must show that the Wisconsin Court of Appeals' decision was an "unreasonable" application of clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). The state court's ruling must be "objectively unreasonable," which means something more than just incorrect or erroneous. *Lockyer v. Andrade*, 123 S.Ct. 1166, 1174 (2003).

The essence of Adams's claim is that it is a violation of due process to civilly commit a person based solely on the fact that he is a previously convicted sex offender with APD. According to Adams, that is precisely what Wisconsin is doing in his case, in contravention of both *Foucha* and *Hendricks*. In response the state asserts that Adams was confined not only because he committed prior crimes and because he has APD, but also because the state proved beyond a reasonable doubt that he is dangerous beyond his control.[1]

We begin our analysis with *Foucha*. A Louisiana court ordered Foucha, an insanity acquittee, committed to a mental institution based upon a doctor's testimony that he had an antisocial personality. The Supreme Court reversed, holding that due process did not permit Foucha's continued confinement, and in passing the Court made these remarks:

> [T]he State asserts that because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be

---

[1] The state also devotes much of its brief to explaining why Chapter 980 is facially constitutional. Its arguments along those lines are irrelevant, however, because Adams is not raising, and we are not deciding, any facial challenges to the statute.

held indefinitely. This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. The same would be true of any convicted criminal, even though he has completed his prison term.

*Foucha*, 504 U.S. at 82-83.

According to Adams's interpretation of this passage, due process prohibits a state from *ever* committing an individual who suffers from nothing more than a personality disorder because otherwise "a state could civilly commit whole categories of criminal offenders by branding them deviant and designating them mentally disordered." Thus, Adams says, because he is being confined based solely on the fact that he is a criminal with APD, the Wisconsin Court of Appeals' decision was "unreasonable" within the meaning of § 2254(d)(1).

We reject Adams's challenge on several grounds. First, as we will explain in more detail below, the Wisconsin appeals court's decision to confine Adams was based on more than just that he is a convicted sex offender with APD, so the factual underpinning of Adams's claim is erroneous. Second, the Supreme Court's decision in *Foucha* was based on a specific combination of factors that is not present in this case: (1) the state, for whatever reason, had conceded that antisocial personality was not a mental disease and there-fore admitted that it was confining someone who was not actually mentally ill, *id.* at 78-79; (2) Foucha was not af-forded constitutionally adequate procedures to establish the grounds for his confinement, *id.* at 79; and (3) the state had not shown that Foucha was dangerous and in fact had no obligation to do so because its statute placed the burden on the *individual* to show that he was *not* dangerous, *id.* at 81-82. Ultimately, the general rule we take from *Foucha* is simply that an insanity acquittee may be held for only as

long as he is still mentally ill; his dangerous propensities alone do not justify continued confinement. *See United States v. Wattleton*, 296 F.3d 1184, 1202 n.35 (11th Cir. 2002); *United States v. Phelps*, 283 F.3d 1176, 1184 (9th Cir. 2002). The Wisconsin appeals court's decision was not an unreasonable application of this rule because there was no dispute during the state court proceedings that Adams has a mental illness—namely, APD. Moreover, even if *Foucha* can be read to have implied in dicta that APD standing alone is insufficient to warrant civil commitment, dicta does not qualify as "clearly established Federal law" for purposes of § 2254(d)(1). *Andrade*, 123 S.Ct. at 1172.

We therefore move on to *Hendricks*. At issue there was a Kansas statute that authorized the civil commitment of persons who, due to a "mental abnormality" or a "personality disorder," were likely to engage in "predatory acts of sexual violence." The Supreme Court upheld the statute against constitutional challenge, observing that similar statutes had been found valid "when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Hendricks*, 521 U.S. at 358. The Court further observed that requiring proof of a "mental illness" or "mental abnormality" serves "to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.* In Hendricks's case it was his "admitted lack of volitional control, coupled with a prediction of future dangerousness, [that] adequately distinguishe[d] [him] from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Id.* at 360.

The Supreme Court clarified *Hendricks* in *Crane*, in which Kansas was seeking the civil commitment of a previously convicted sexual offender who suffered from both exhibitionism and APD. The state court had interpreted *Hendricks* as insisting upon proof that the individual is

*completely* unable to control his behavior, but the Supreme Court found that reading to be too rigid. Rather, what *Hendricks* requires is "proof of serious difficulty in controlling behavior," which

> when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.

*Crane*, 534 U.S. at 413 (citing *Foucha*, 504 U.S. at 82-83). That distinction, the Court explained, is necessary "lest 'civil commitment' become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment." *Id.* at 412 (quoting *Hendricks*, 521 U.S. at 372-73 (Kennedy, J., concurring)).[2]

Before examining whether the Wisconsin Court of Appeals' decision was an unreasonable application of *Hendricks*, we must first decide what effect, if any, *Crane* has on our analysis. Though the state argued before the district court that *Crane* set forth a new rule of constitutional law that did not apply retroactively to Adams's claim, both parties now agree that *Crane* did not create a new rule but simply reaffirmed and clarified the holding in *Hendricks*. We will assume, without deciding, that that is correct, and so we are not faced with any questions of retroactivity. Further, as Adams acknowledges, *Crane* cannot be considered "clearly established Federal law" within the meaning of

---

[2] Interestingly, the Court noted in an immediately following parenthetical that 40 to 60% of the male prison population is diagnosable with APD. *Id.* (citing Moran, The Epidemiology of Antisocial Personality Disorder, 34 *Social Psychiatry & Psychiatric Epidemiology*, 231, 234 (1999)).

§ 2254(d)(1) because it was not decided until after the Wisconsin appeals court rendered its decision in this case. We do agree with Adams, however, that *Crane* is still relevant to the extent it can inform our understanding of *Hendricks. See Linehan v. Milczark*, 315 F.3d 920, 926-27 (8th Cir. 2003).

Adams's claim that the Wisconsin appeals court unreasonably applied *Hendricks* is based on his belief that he is being confined solely because he is a convicted sex offender with APD, which he points out is a relatively common disorder in the male prison population. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 704 (rev. 4th ed. 2000) (reporting that prevalence of APD within clinical settings have varied from 3% to 30% and that even higher prevalence rates are associated with substance abuse treatment settings and prison or forensic settings). He then asserts that, because APD is so prevalent in the prison population, the appeals court did not make any findings that "adequately distinguishes [him] from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Hendricks*, 521 U.S. at 360.

We disagree with Adams's characterization of the appeals court's decision. The court found Adams eligible for confinement under Chapter 980 not only because he is a sex offender with APD but also because there was enough evidence in the trial record to establish that Adams was "substantially probable" to commit another sexually violent offense. *Adams*, 588 N.W.2d at 342. Specifically, the court noted evidence of "Adams's history of sexually violent crimes, history of non-sexual crimes and antisocial behavior, failures under court-ordered supervision, denial of responsibility, refusal to participate in sexual assault treatment programs and drug/alcohol treatment programs, and his sexual offense recidivism." *Id.* at 341-42. The court also noted Dr. Diamond's testimony that Adams is "a risk and

it's highly probable that he would recommit and reoffend" and Dr. Sindberg's testimony that "based on his evaluation of thirty-one risk factors, there was a substantial probability that [Adams] will reoffend or recommit a sexually violent act." *Id.* (quotations omitted). Given this record, we cannot say that it was *unreasonable* for the court to find that the nature of Adams's mental disorder was sufficient to distinguish him from the "typical recidivist convicted in an ordinary criminal case." *Crane*, 534 U.S. at 413.

We find additional support for our conclusion in *Linehan*, where the petitioner made the identical argument that Adams is making now—that the fact that he had APD, a disorder which can be diagnosed in the majority of the male prison population, failed to distinguish him from "other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Linehan*, 315 F.3d at 928 (quoting *Crane*, 534 U.S. at 412). The Eighth Circuit rejected this claim after considering the state court's specific findings regarding Linehan's lack of control over his impulses. For instance the state court found that Linehan's aggressiveness toward hospital and prison staff indicated an inability to control his behavior even when subject to careful supervision. The state court also noted that Linehan had escaped from prison twenty years earlier and had attacked a young girl within just two weeks of his escape. Finally, the court noted that Linehan had recently been observed masturbating within minutes of physical play with his seven-year-old stepdaughter. *Id.*

Based on this evidence, the Eighth Circuit held that the state court did not unreasonably apply *Hendricks*, as clarified by *Crane*, in concluding that Linehan was different from the typical recidivist because he "lacked adequate control over his impulses" and therefore that he "suffered from *a form* of APD that warranted civil commitment under constitutional standards." *Id.* at 929 (emphasis added). We reach the same conclusion here. Though the evidence in

Adams's case was somewhat less than that in *Linehan*, we still believe that it was sufficient for the Wisconsin appeals court to reasonably conclude that Adams was eligible for civil commitment, not just because he suffered from APD but also because the specific nature of his disorder made him "dangerous beyond [his] control." *Hendricks*, 521 U.S. at 358.

### III. CONCLUSION

We emphasize again that we are not deciding any questions regarding the facial validity of Chapter 980, nor are we deciding whether the Wisconsin Court of Appeals' decision was an unreasonable application of *Crane*. The only question before us, which we consider under the highly deferential standard applicable on habeas review, is whether the court unreasonably applied either *Hendricks* or *Foucha*. We conclude that it did not, and so the district court's denial of Adams's § 2254 petition is AFFIRMED.

A true Copy:

     Teste:

 

               _____
               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*