*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0550**

In the Matter of the Civil Commitment of: Brian Lee Wilbur.

**Filed September 21, 2015
Affirmed
Reyes, Judge**

Hennepin County District Court
File No. 27MHPR141002

Ron Thorsett, Eden Prairie, Minnesota (for appellant)

Michael O. Freeman, Hennepin County Attorney, John L. Kirwin, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Considered and decided by Reyes, Presiding Judge; Schellhas, Judge; and Larkin, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REYES**, Judge

Appellant Brian Lee Wilbur challenges his commitment to the Minnesota sex-offender program (MSOP) as a sexually dangerous person (SDP) under the Minnesota Commitment and Treatment Act (the MCTA). Minn. Stat. §§ 253D.01-.36 (2014). Appellant argues that (1) he does not meet the statutory criteria for commitment as an SDP and (2) a less-restrictive treatment program is available. We affirm.

## FACTS

### I.      1987 Sex Offense

In November 1987, appellant physically assaulted C.W., his then wife, and sexually assaulted A.M.G., C.W.'s 15-year-old sister who was staying the night at appellant's and C.W.'s apartment. He pleaded guilty to one count of fourth-degree criminal sexual assault and received a 21-month sentence, stayed for five years. The stay was revoked when appellant was convicted of the 1988 offense described below.

### II.      1988 Sex Offense

In May 1988, appellant sexually assaulted a five-year-old girl, A.P., who lived in his apartment complex. Appellant pleaded not guilty to second-degree criminal sexual conduct but was found guilty by a jury. He was sentenced to 36 months served concurrently with the 21-month sentence he received from his 1987 conviction. While incarcerated, appellant was evaluated and referred to the transitional-sex-offender program (TSOP). A report from the TSOP stated that appellant "was minimizing and justifying his behavior" at first but later "significantly improved in his ability to express responsibility for his offense." Appellant was terminated from the TSOP after staff discovered marijuana in his room. He was paroled in May 1990, and his sentence expired in May 1991.

### III.      1992 Window-Peeping Offense

In March 1992, neighbors observed a man moving between two windows of a neighbor's home. Appellant pleaded guilty to peeping and received a stayed

2

misdemeanor sentence. He was required to attend sex-offender treatment as a part of his probation, but he failed to do so.

## IV.     1997 Sex Offense

In June 1997, appellant sexually assaulted a 25-year-old woman, C.O., in her apartment while she was sleeping, unclothed, in her bedroom. Appellant was charged with second-degree criminal sexual conduct, fourth-degree criminal sexual conduct, first-degree burglary, and first-degree burglary motivated by or committed in furtherance of sexual contact or penetration. Appellant denied the charges. A jury found appellant guilty on all counts, and he was sentenced to 300 months in prison.

## V.     Incarceration and Treatment

In March 2009, appellant was deemed appropriate for MSOP placement. Appellant initially refused, but accepted after being informed that he would be subject to further discipline if he did not attend. His initial progress in the program was good, and staff members generally perceived appellant as a good participant in treatment. However, appellant began to have repeated disputes with treatment goals and resentment toward facilitators. In July 2010, appellant decided to drop out of the program. He was charged with and convicted of medical-treatment refusal, which resulted in an additional 360 days of extended incarceration.

In 2014, appellant was referred to Department of Correction (DOC) psychologist James Olson for possible civil commitment as an SDP or sexual psychopathic personality (SPP). Olson used two actuarial tools to predict the likelihood of sexual recidivism: the MnSOST-3.1.2 (MnSOST) and the Static-99R. The MnSOST indicated the probability

3

of sexual recidivism for appellant was 1.96% with a percentile rank of 35.5%, which placed him in a group of offenders considered at a low likelihood of re-offense. On the Static-99R, Olson scored appellant as an offender with a high likelihood of sexual re-offense. Later in 2014, a different DOC committee reassessed appellant and designated him as a moderate risk level for re-offense.

With appellant's 300-month sentence set to expire on March 23, 2015, the state petitioned for appellant's commitment as an SPP and SDP. The state eventually withdrew the petition for commitment as an SPP and only the petition for commitment as an SDP was tried. The district court appointed forensic psychologist Michael Thompson, Psy.D., LP, to serve as the district court's first examiner. Appellant chose the second examiner, Paul Reitman, Ph.D., LP. During a four-day trial, both examiners concluded that appellant satisfied the statutory definition of an SDP. The district court committed appellant to the MSOP as an SDP. This appeal followed.

## D E C I S I O N

Appellant asserts that the district court erred by (1) committing appellant as an SDP and (2) concluding that there were no less-restrictive alternatives to commitment. Both arguments are addressed below.

**I.      The district court did not err by committing appellant as an SDP.**

The elements of commitment must be established by clear and convincing evidence. *See* Minn. Stat. § 253D.07, subd. 3. On review, we defer to the district court's findings of fact and will not reverse those findings unless they are clearly erroneous. *In re Civil Commitment of Ramey*, 648 N.W.2d 260, 269 (Minn. App. 2002), *review denied*

4

(Minn. Sept. 17, 2002). But we review de novo "whether there is clear and convincing evidence in the record to support the district court's conclusion that appellant meets the standards for commitment." *In re Thulin*, 660 N.W.2d 140, 144 (Minn. App. 2003). We review the record in the light most favorable to the district court's decision. *In re Knops*, 536 N.W.2d 616, 620 (Minn. 1995). Additionally, when, as here, "the findings of fact rest almost entirely on expert testimony, the [district] court's evaluation of credibility is of particular significance." *Id.*

To be committed as an SDP, an individual must be found to be someone who: (1) has engaged in a course of harmful sexual conduct; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct. Minn. Stat. § 253D.02, subd. 16(a). "Harmful sexual conduct" is defined as "sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another." *Id.*, subd. 8. Here, appellant only challenges the second and third elements of section 253D.02, subdivision 16(a).

## A.    Sexual, Personality, or other Mental Disorder or Dysfunction

Appellant disputes the district court's conclusion that there is clear and convincing evidence that he suffers from mental disorders which impair his ability to adequately control his sexual impulses. Appellant's argument is twofold— first, he challenges the district court's finding that he had any mental disorder at all; and second, he challenges the district court's finding that he had a mental disorder which does not allow him to adequately control his sexual impulses.

Appellant argues that the record does not support his diagnoses of paraphilia and antisocial personality disorder (APD). But both Dr. Thompson and Dr. Reitman concluded that appellant suffered from sexual paraphilia and APD. Dr. Thompson stated in his submitted report and at trial that appellant suffers from "Paraphilia Not Otherwise Specified"[1] and specifically applied the criteria for that diagnosis to appellant. Appellant ignores Dr. Thompson's clear APD diagnosis and instead points out that Dr. Reitman first failed to include an APD diagnosis in his report but later did so at trial. But at trial Dr. Reitman clarified that while he initially doubted whether appellant met the APD criteria, he changed his mind when he was writing his report, and his failure to include the diagnosis was simply an oversight. Moreover, Minnesota courts have specifically upheld the use of disorders such as APD and paraphilia for the purpose of commitment as an SDP. *See In re Linehan*, 594 N.W.2d 867, 875 (Minn. 1999) (*Linehan IV*); *In re Civil Commitment of Navratil*, 799 N.W.2d 643, 648 (Minn. App. 2011), *review denied* (Minn. Aug. 24, 2011).

Appellant next argues that there was not clear and convincing evidence that he lacked adequate control of his sexual impulses. The supreme court has interpreted the MCTA to require a showing that the person's disorder "does not allow [him] to *adequately* control [his] sexual impulses." *Linehan IV*, at 876 (emphasis added); *see also In re Martinelli*, 649 N.W.2d 886, 890-91 (Minn. App. 2002) (determining that the "adequate lack of control" standard and the "'serious difficulty' in controlling behavior"

---

[1] "Paraphilia Not Otherwise Specified" is a disorder that meets the requirements of paraphilia but does not fall within a listed subcategory, such as pedophilia.

standard are the same). The United States Supreme Court later affirmed this position. *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 870 (2002) ("It is enough to say that there must be proof of serious difficulty in controlling behavior.").

Here, both court examiners clearly stated that appellant's disorders prevent him from adequately controlling his sexual impulses. Dr. Thompson testified that appellant's disorders prevent adequate control of his impulses and that his criminal history shows that he continued to commit sexual offenses even after facing legal sanctions. Dr. Thompson stated that he will likely always struggle with alcohol, which also plays a part in his inability to adequately control his impulses. Dr. Reitman agreed that appellant's history suggests impulsive behavior and emphasized that appellant's failure to receive treatment while imprisoned further demonstrates his inability to control himself. Accordingly, the district court did not err in determining that there is clear and convincing evidence that appellant's disorders do not allow him to adequately control his sexual impulses.[2]

_____

[2] Appellant repeatedly makes the argument that the examiners' diagnoses fail to distinguish him from a typical recidivist. This argument is based on the Supreme Court's opinion in *Crane,* which states that proof of lack of adequate control "must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." 534 U.S. at 413, 122 S. Ct. at 870. But, as the state points out, the Eighth Circuit has specifically held that the criteria for committing an individual under the MCTA, taken together, will automatically satisfy the "sufficient to distinguish" requirement under *Crane*. *Linehan v. Milczark*, 315 F.3d 920, 927 (8th Cir. 2003). Therefore, no separate analysis under *Crane* is required.

**B.      Likely to Engage in Acts of Harmful Sexual Conduct**

To be committed as an SDP, appellant must also be likely to engage in acts of harmful sexual conduct. Minn. Stat. § 253D.02, subd. 16(a)(3). The supreme court has construed the phrase "likely to engage in acts of harmful sexual conduct" to require a showing that it is "highly likely" to occur. *In re Linehan*, 557 N.W.2d 171, 190 (Minn. 1996) (*Linehan III*), *vacated on other grounds*, 522 U.S. 1011, 118 S. Ct. 596 (1997), *aff'd on remand*, 594 N.W.2d 867 (Minn. 1999). When examining whether an offender is highly likely to engage in acts of harmful sexual conduct, a district court considers six factors. *Linehan III*, 557 N.W.2d at 189 ("We conclude that the guidelines for dangerousness prediction in [*In re Linehan*, 518 N .W.2d 609 (Minn. 1994) (*Linehan I*)] apply to the SDP Act . . . ."). Those factors are: (1) relevant demographic characteristics; (2) history of violent behavior; (3) base rate statistics for violent behavior among those with the individual's background; (4) sources of stress in the individual's environment; (5) the similarity of the individual's present or future context to the context in which the individual engaged in harmful sexual conduct in the past; and (6) the individual's record in sex therapy programs. *Linehan I*, 518 N.W.2d at 614. "No single factor is determinative of this complex issue." *Navratil*, 799 N.W.2d at 649. We will not reverse the district court's findings unless they are clearly erroneous, and deference is given to the district court's credibility determinations. *Ramey*, 648 N.W.2d at 269.

In considering the *Linehan* factors, the district court concluded that "the great weight of the evidence under the multi-factor analysis suggests that [appellant] is highly likely to reoffend." Both examiners concluded that appellant was highly likely to

sexually re-offend if not committed. Dr. Thompson specifically addressed each of the six *Linehan* factors in his report, while Dr. Reitman provided testimony as to those factors at trial. Appellant contends that, with the exception of the sixth factor, the record established that all of the *Linehan* factors were either neutral or in his favor. We conclude that the record supports the district court's assessment of the factors.

### 1. Relevant demographic characteristics

The district court determined that the first *Linehan* factor weighed in favor of appellant because, as Dr. Thompson testified, his age, 49, has been shown to mediate the risk of re-offense compared to that of a younger person. The district court recognized that this factor weighs in favor of appellant, and the state agrees.

### 2. History of violent behavior

Appellant argues that there is no evidence that his past victims were either threatened with or suffered serious physical harm during his sexual offenses. In addition to ignoring the physical violence detailed in the police reports, this argument mischaracterizes the law. This court has held that "the [SDP] statute does not require a showing of violence." *In re Robb*, 622 N.W.2d 564, 573 (Minn. App. 2001), *review denied* (Minn. Apr. 17, 2001). Instead, the statute only requires a showing that the individual "is likely to engage in acts of harmful sexual conduct." *Id.* (quoting Minn. Stat. § 253D.02, subd. 16(a)(3)). And "harmful sexual conduct" is defined in terms of "serious physical *or* emotional harm." Minn. Stat. § 253D.02, subd. 8 (emphasis added). Here, Dr. Reitman testified that "there's no question" that the victims likely suffered "serious emotional and physical harm," including "post-traumatic stress

9

disorder . . . , neurological impairment . . . , higher risk for psychiatric disorders, . . . higher risk for substance abuse." Dr. Thompson agreed that the victims likely suffered physical and psychological trauma, including acute stress reactions and post-traumatic stress disorder. The presentence investigation from the 1997 offense specifically outlined the victim's physical and emotional harm. The district court did not clearly err in determining that this factor weighed in favor of commitment.

### 3. Base-rate statistics

Appellant next contests the base-rate statistics and actuarial tools used to predict the likelihood of re-offending. Dr. Thompson used three assessment tools: the MnSOST, the Static-2002R, and the PCL-R. Dr. Thompson's MnSOST results were low, indicating only a 2.2% likelihood of re-offense in the next four years. The Static-2002R evaluation indicated a moderate-high risk of re-offense and a 10-year re-offense rate of 39%. Dr. Thompson gave appellant a PCL-R score which indicated a high risk of recidivism. Dr. Reitman used two assessment tools: the Static-99R and the PCL-R. The Static-99R score indicated that appellant had a moderate-high re-offense risk and the PCL-R score indicated a high risk of re-offense. And as previously mentioned, DOC psychologist James Olson also employed the MnSOST and Static-99R to evaluate appellant. Olson's results indicated a low likelihood of re-offense on the MnSOST but a high likelihood of re-offense on the Static-99R.

10

Appellant argues that only the MnSOST results should be credited and asks this court to give it greater weight than the other assessment tools.[3] But in performing the *Linehan* analysis, appellate courts "will not weigh the evidence." *Linehan III*, 557 N.W.2d at 189. The supreme court reiterated that the "dangerousness prediction under [the MCTA] is not simply a matter for statisticians." *Id.* at 191. Accordingly, we are not persuaded by appellant's argument that the third *Linehan* factor weighs in his favor and the district court did not err in ruling as such.

### 4.    Sources of stress

Dr. Thompson indicated that appellant's vocational training meant that he was a stronger candidate for employment than most individuals coming out of prison.[4] However, Dr. Thompson also noted appellant's "long-standing issue with authority figures" and that it could be "quite a problem." Dr. Thompson further noted that the issue "runs deep," as evidenced by appellant's self-terminated sexual-offender treatment. Appellant has not shown that the district court clearly erred when it found that this factor weighed in favor of commitment.

---

[3] We note that appellant correctly points out that the district court clearly erred in reciting Dr. Thompson's MnSOST results. The district court found that Dr. Thompson's MnSOST assessment indicated a 35% recidivism rate. In fact, Dr. Thompson's MnSOST assessment indicated a 35th percentile rank among offenders, and a re-offense rate much closer to 2%. However, appellant did not suffer any prejudice from this error because a number of other assessment tools indicated a moderate-high risk or high risk of re-offense.

[4] Dr. Reitman did not give significant testimony related to this factor.

### 5. Similarity of present or future context to context in which individual engaged in harmful conduct

Appellant argues that his skill, attitude, and motivation to make a successful transition into the community all exhibit a different future context than that in which he engaged in harmful conduct. However, Dr. Thompson reported that because appellant engaged in harmful conduct in a wide variety of situations with victims of different ages and relationships, appellant would present a risk of re-offending in almost any situation. Dr. Thompson also testified that, despite appellant's sobriety while imprisoned, alcohol abuse "likely will always be a struggle." Appellant has not shown that the district court clearly erred when it found that this factor weighed in favor of commitment.

### 6. Record in sex-therapy programs

Appellant admits that he has a poor record with sex-therapy programs, but argues that he is currently amenable to such programs and that he has knowledge of the program's treatments as a result of experience and independent study. But appellant cites no authority for the proposition that current willingness or independent knowledge of treatment should be included in evaluating an offender's sex-therapy record. Moreover, Dr. Thompson testified that appellant's current willingness to attended therapy is likely a "bargaining process" and that it is "conditional on the treatment being presented in a modality (outpatient) that [appellant] agrees with." Dr. Thompson further questioned appellant's amenability to treatment because appellant "admits only minimally that he engaged in problematic sexual behavior." Appellant has not shown that the district court clearly erred in finding that this factor weighed in favor of commitment.

In sum, the record clearly and convincingly supports the district court's conclusion that appellant meets the standard for commitment. Appellant's arguments essentially ask this court to discredit the testimony of the court examiners and give greater weight to his own opinions regarding the *Linehan* factors. Because the district court's evaluation of credibility is of particular significance, *Knops*, 536 N.W.2d at 620, and we are not allowed to reweigh the evidence, *Linehan III*, 557 N.W.2d at 189, appellant's arguments fail.

## II. The district court did not err by concluding that there were no less-restrictive alternatives to commitment.

Upon a finding that an individual is an SDP, a district court "shall commit the person to a secure treatment facility unless the person establishes by clear and convincing evidence that a less restrictive treatment program is available, is willing to accept the person under commitment, and is consistent with the person's treatment needs and the requirements of public safety." Minn. Stat. § 253D.07, subd. 3. "Under the current statute, patients have the opportunity to prove that a less-restrictive treatment program is available, but they do not have the right to be assigned to it." *In re Kindschy*, 634 N.W.2d 723, 731 (Minn. App. 2001) (emphasis omitted), *review denied* (Minn. Dec. 19, 2001). "[T]he burden of proving that a less-restrictive program is available is on the patient." *Robb*, 622 N.W.2d at 574. This court will not reverse a district court's findings on the propriety of a treatment program unless its findings are clearly erroneous. *Thulin*, 660 N.W.2d at 144.

Appellant argues that the district court erred in concluding that a less-restrictive treatment program is unavailable because he would be on intensive supervised release (ISR) until 2032. Appellant points out that under ISR, he would be eligible for sex-offender-treatment programs or a halfway house. But he identifies no specific facility that "is willing to accept [appellant] under commitment." *See* Minn. Stat. § 253D.07, subd. 3. Instead, appellant relies heavily on the testimony of DOC caseworker Jean Rudebeck for support that ISR is consistent with appellant's treatment needs and the requirements of public safety. But Dr. Reitman testified that the amount and length of supervision received during ISR would be insufficient. And Dr. Thompson stated that it would be in the community's best interest to commit appellant to a secure setting like the MSOP. The district court credited this testimony in determining that no other sex-offender program can satisfy the requirements of section 253D.07, subdivision 3. Appellant again improperly asks this court to make a credibility determination, and we will not do so. The district court did not clearly err in finding that no less-restrictive programs were available.

**Affirmed.**